# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                                                                                                                                                                                                                                                        |                       |
| ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- | --------------------- |
| **PENSION BENEFIT GUARANTY CORPORATION,** )  <br> **Plaintiff,** )                                                                                                                                                                                      |                       |
| v. )                                                                                                                                                                                                                                                    |                       |
| **UNITED AIR LINES, INC., as Plan Administrator for** )  <br> **the United Airlines Pilot Defined Benefit Pension Plan,** )                                                                                                                              |                       |
| **Defendant,** )                                                                                                                                                                                                                                        | No. 06 C 1222         |
| **and** )                                                                                                                                                                                                                                               | Judge Joan H. Lefkow  |
| **AIR LINE PILOTS ASSOCIATION,** )  <br> **INTERNATIONAL, UNITED RETIRED PILOTS** )  <br> **BENEFIT PROTECTION ASSOCIATION,** )  <br> **ROGER D. HALL, DENNIS D. DILLON,** )  <br> **GERARD TERSTIEGE, EUGENE M. CUMMINGS,** )  <br> **RAYMOND P. FINK, JAMES M. KRASNO and** )  <br> **WILLIAM L. RUTHERFORD,** ) |                       |
| **Intervenors.** )                                                                                                                                                                                                                                      |                       |

## MEMORANDUM OPINION AND ORDER

This case arises from the decision of the Pension Benefit Guarantee Corporation ("PBGC")

to seek a judicial decree authorizing the involuntary termination of a pension plan sponsored by

United Airlines, Inc. ("United"). The court referred this matter to the bankruptcy court, where

United's Chapter 11 bankruptcy was pending in front of the Honorable Eugene R. Wedoff.

Following a trial, this matter has returned to this court accompanied by the bankruptcy court's

proposed findings of fact and conclusions of law. The bankruptcy court recommended finding that

PBGC met its burden of establishing that termination of the United Airlines Pilot Defined Benefit

Pension Plan was necessary to avoid an unreasonable increase in PBGC's liability under Title IV of

the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1342(c), with an effective termination date of December 30, 2004. Also before the court are the objections of PBGC, the Airline Pilots Association ("ALPA"), International, and the United Retired Pilots Benefit Protection Association ("RPA") to the bankruptcy court's proposed findings of fact and conclusions of law. For the reasons stated below, the court accepts the recommendations of the bankruptcy court as modified.

## I. BACKGROUND

Although the parties are abundantly familiar with the events leading up to the present decision, for the sake of completeness, the court will provide a brief recapitulation of the background of this case.

### A. The Pilot Plan

Pursuant to a collective bargaining agreement between United and Airline Pilots Association, International, the exclusive collective bargaining representative of United's pilots, United maintained the United Airlines Pilot Defined Benefit Pension Plan (the "Pilot Plan") and served as the plan sponsor and administrator.

United and twenty-seven related corporations filed voluntary Chapter 11 cases in the bankruptcy court on December 9, 2002. Thereafter, United entered into negotiations with ALPA regarding the Pilot Plan. United and ALPA ultimately reached an agreement to modify the collective bargaining agreement to eliminate the pension plans created by the collective bargaining agreement. On December 17, 2004, United filed a Motion to Approve Letter of Agreement Modifying Their Collective Bargaining Agreement with ALPA. The bankruptcy court denied this initial motion but later approved a modified version of the agreement. Both versions of the agreement provided, *inter*

2

*alia*, that ALPA would not "oppose the Company's efforts to terminate the A Plan under 29 U.S.C. § 1341(c)" as long as United did not seek to terminate the Pilot Plan before May 2005. Both versions further provided that the Pilot Plan would "remain in full force and effect" until United met the requirements for a distress termination under 29 U.S.C. § 1341, and that nothing in the Letter of Agreement "shall be construed, deemed or characterized by UAL or the Company as any agreement of any form by the Association that the A Plan should be terminated."

The United Retired Pilots Benefit Protection Association ("URPA"), which is an Illinois not-for-profit corporation created to protect the benefits of United's retired pilots, had attempted to participate in the negotiations, but United did not permit URPA's participation. URPA filed a motion in the bankruptcy court which asked for the appointment of an authorized representative to represent United's retired pilots and their pension benefits. The bankruptcy court denied this motion, which both the district court, *per* Judge Darrah, and the Seventh Circuit Court of Appeals upheld on appeal.

## B. PBGC

PBGC is a federal corporation established under 29 U.S.C. § 1302(a) to administer the insurance program for defined benefit pension plans created under Title IV of ERISA, 29 U.S.C. §§ 1301-1461. PBGC guarantees certain benefits under ERISA pension plans and has authority pursuant to ERISA to terminate underfunded pension plans. *See* 29 U.S.C. § 1342.

In December of 2004, PBGC determined that the Pilot Plan should be terminated in order to avoid an unreasonable increase in PBGC's liability. United refused to consent to a termination of the Pilot Plan. On December 29, 2004, the Executive Director of PBGC issued a Notice of Determination, which provided

3

> [T]he Pension Benefit Guaranty Corporation ("PBGC") has determined, under section 4042(a)(4) of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. § 1342(a)(4), that the United Airlines Pilot Defined Benefit Pension Plan ("Plan") must be terminated because the possible long-run loss of the corporation with respect to the Plan may reasonably be expected to increase unreasonably if the Plan is not terminated. PBGC further determined, under ERISA § 4042(c), 29 U.S.C. § 1342(c), that the Plan must be terminated in order to avoid any unreasonable increase in the liability of the fund. Accordingly, PBGC intends to proceed under ERISA § 4042, 29 U.S.C. § 1342, to have the Plan terminated and PBGC appointed as statutory trustee, and under ERISA § 4048, 29 U.S.C. § 1348, to have December 30, 2004, established as the Plan's termination date.

That same day, PBGC sent the Notice of Determination to United and ALPA via overnight mail, which ALPA received on December 30, 2004. Also on December 30, the Notice of Determination was published nationally in *USA Today* and in newspapers serving United's hubs, including *The Chicago Tribune, The Washington Post, The Los Angeles Times, The San Francisco Chronicle, The Denver Post,* and *The Rocky Mountain News.* Additionally, PBGC, United, and ALPA published press releases on their websites announcing PBGC's decision to seek termination of the Pilot Plan.

On December 30, 2004, PBGC filed a complaint in this court against United as administrator of the Pilot Plan, seeking a decree of termination of the Pilot Plan pursuant to § 1342(c) of ERISA.

## C. Referral of Proceedings by This Court to the Bankruptcy Court

On January 4, 2005, United filed an Emergency Motion to Confirm Automatic Referral to the United States Bankruptcy Court for the Northern District of Illinois Pursuant to Internal Operating Procedure 15(a), arguing that PBGC's complaint fell within the bankruptcy court's "related to" jurisdiction under 28 U.S.C. § 157(a) and requesting that the case be assigned to the bankruptcy court overseeing United's Chapter 11 proceedings. In opposing United's emergency motion, PBGC argued that the bankruptcy court did not have jurisdiction over PBGC's complaint because the structure of ERISA's pension plan termination provisions and the language of 29 U.S.C.

4

§ 1342(c) provided for exclusive jurisdiction in "the appropriate United States District Court."

On January 25, 2005, this court granted United's emergency motion and transferred the case to the bankruptcy court. The bankruptcy court subsequently granted the motions to intervene of ALPA, URPA, and certain individual retired pilots. PBGC moved this court to reconsider the referral to the bankruptcy court or, in the alternative, for a certification to file an interlocutory appeal.[1]

## D. Bankruptcy Court Proceedings

On April 13, 2005, the bankruptcy court determined that it would permit discovery beyond PBGC's administrative record. PBGC moved for summary judgment on June 6, 2005, arguing that its decision to seek a termination of the Pilot Plan was entitled to judicial deference and that its decision to initiate termination had not been arbitrary or capricious. PBGC further argued that the notice provided to the plan participants was sufficient to set the termination date as of December 30, 2004. United, ALPA, and URPA opposed PBGC's motion for summary judgment.

The bankruptcy court issued a preliminary ruling on PBGC's motion for summary judgment on August 25, 2005. The bankruptcy court subsequently issued an Amended Memorandum of Decision on Motion for Summary Judgment on October 26, 2005, ruling that PBGC's adversary proceeding was a core proceeding. As a consequence, the bankruptcy court entered a final judgment. In this judgment, the bankruptcy court held that a trial was required as to whether PBGC established the propriety of terminating the Pilot Plan by a preponderance of the evidence; that § 1342(c) required a *de novo* determination of the appropriateness of the Pilot Plan termination, and not a deferential review under the Administrative Procedure Act; and that the constructive notice to the

---

[1]This motion was terminated in error on September 9, 2005.

5

Pilot Plan participants was sufficient to establish a termination date of December 30, 2004.

Following a bench trial, the bankruptcy court issued a Memorandum of Decision, holding that PBGC had showed that continued operation of the Pilot Plan beyond December 30, 2004 would result in an unreasonable increase in liability of PBGC's fund, and as a result, PBGC was entitled to a decree terminating the Pilot Plan pursuant to 29 U.S.C. § 1342(c) as of December 30, 2004. On October 28, 2005, the bankruptcy court entered its order retroactively terminating the Pilot Plan to December 30, 2004.

## E.    Appeal from the Bankruptcy Court Proceedings Before Judge Darrah

Thereafter, on November 4, 2005, ALPA filed a notice of appeal in the district court. URPA filed its notice of appeal on November 7, 2005. PBGC filed a cross-appeal on November 16, 2005. These appeals from the bankruptcy court's final orders were assigned to Judge Darrah, Civil Case No. 05 C 6955.

PBGC raised three issues on appeal: (1) the district court erred in referring the termination proceeding to the bankruptcy court; (2) the bankruptcy court erred in finding that the termination was a core proceeding; and (3) the bankruptcy court erred by holding a *de novo* trial. PBGC, however, did not file a timely notice of appeal, and Judge Darrah dismissed PBGC's cross-appeal as untimely.

Because PBGC and URPA had challenged the bankruptcy court's jurisdiction, an issue that may be raised at any time, Judge Darrah considered their arguments that the bankruptcy court did not have jurisdiction to enter a final judgment in the termination proceeding because the termination was not a core proceeding. Judge Darrah ruled that the termination proceeding filed by PBGC pursuant to Title IV of ERISA was a non-core proceeding. Accordingly, the bankruptcy court had

6

exceeded its limited jurisdiction by issuing a final judgment rather than submitting proposed findings of fact and conclusions of law to the district court, as required by § 157(c)(1). Judge Darrah reversed the final judgments of the bankruptcy court and remanded the case for proceedings consistent with 28 U.S.C. 157(c). Judge Darrah then dismissed the appeals of ALPA and URPA as moot.

### F. Remand to the Bankruptcy Court and Subsequent Appeal of the Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law to This Court

On February 13, 2006, the bankruptcy court adopted as its recommendation to the district court the two previously issued memoranda, with the exception of those portions of the memoranda that addressed its jurisdiction, issuing its proposed findings of fact and conclusions of law on the motion for summary judgment and the subsequent trial.

On February 24, 2006, PBGC filed its objections to the bankruptcy court's proposed findings of fact and conclusions of law to which United, ALPA, and URPA responded. ALPA and URPA also have filed objections to the bankruptcy court's proposed findings and conclusions to which PBGC responded. These objections are presently before this court.

## II. STANDARD OF REVIEW

In non-core proceedings, *i.e.*, cases that are not directly related to matters arising under Title 11, the bankruptcy court must submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1). The district court then conducts a *de novo* review of the bankruptcy court's proposed findings of fact and conclusions of law to which a party has made a specific written objection. *Id.*; Fed. R. Bank. Proc. 9033(d). The district court may accept, reject, or modify the proposed findings of fact and conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions. Fed. R. Bank. Proc. 9033(d).

7

## III.   ANALYSIS

PBGC objects to the bankruptcy court's proposed findings of fact and conclusions of law on the ground that the bankruptcy court applied the *de novo* standard when it reviewed PBGC's decision to terminate the Pilot Plan rather than reviewing PBGC's determination on the administrative record under the arbitrary and capricious standard. PBGC also requests that this court reconsider and reverse its decision referring the involuntary termination proceeding to the bankruptcy court. PBGC asks this court to hold that it will review PBGC's termination decision on the agency's administrative record under the arbitrary and capricious standard. Finally, PBGC seeks an order that the parties promptly submit summary judgment motions on the issue of whether PBGC's determination that the Pilot Plan should be terminated was arbitrary and capricious.

Both ALPA and URPA object to the bankruptcy court's conclusion that PBGC met its burden of proof that the Pilot Plan should be terminated, effective December 30, 2004, under § 1342(c). ALPA further argues that PBGC was required to provide individualized notice to each of the approximately 15,000 participants of the Pilot Plan. The court will address each argument in turn.

### A.   Referral to the Bankruptcy Court

As a preliminary matter, PBGC requests that this court reconsider its referral of PBGC's action to terminate the Pilot Plan to the bankruptcy court. A motion for reconsideration serves the limited function to correct manifest errors of law or fact or to present newly discovered evidence, and whether to grant such a motion is within the discretion of the court. *Caisse Nationale Credit Agricole* v. *CBI Indus., Inc.*, 90 F.3d 1264, 1269-70 (7th Cir. 1996). The problems warranting such a grant are rare. *Bank of Waunakee* v. *Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). The motion also serves a valuable function where the court "has patently

8

misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Id.*

While PBGC contested the court's referral of the action to the bankruptcy court, PBGC ultimately prevailed in the bankruptcy court. The court sees no reason to reconsider the referral at this late stage in the proceedings, particularly when PBGC is only raising arguments that the court considered and rejected previously. As a consequence, PBGC's motion to reconsider is denied.

## B. Appropriate Standard of Review for an Involuntary Termination Action Under 29 U.S.C. § 1342(c)

Title IV of ERISA establishes the exclusive means for terminating a defined benefit pension plan regulated by statute. 29 U.S.C. § 1341(a). In enacting section 1342(c) of ERISA, Congress authorized PBGC to institute proceedings to terminate a plan whenever PBGC determines that one of four enumerated circumstances exists.[2] 29 U.S.C. § 1342(a)(1)-(4). As relevant to the present

---

[2]29 U.S.C. § 1342(a) states:

The corporation may institute proceedings under this section to terminate a plan whenever it determines that - -

(1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4971(a) of Title 26,

(2) the plan will be unable to pay benefits when due,

(3) the reportable event described in section 1343(c)(7) of this title has occurred, or

(4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

The corporation shall as soon as practicable institute proceedings under this section to terminate a single-employer plan whenever the corporation determines that the plan does not have assets available to pay benefits which are currently due under the terms of the plan. The corporation may prescribe a simplified procedure to follow in terminating small plans as long as that procedure includes substantial safeguards for the rights of the participants and beneficiaries under the plans, and for the employers who maintain such plans (including the requirement for a court decree under subsection (c) of this section). Notwithstanding any other provision of this subchapter, the corporation is authorized to pool assets of terminated plans for purposes of administration, investment, payment of liabilities of all such terminated plans, and such other purposes as it determines to be appropriate in the administration of this subchapter.

9

matter, PBGC may institute proceedings to terminate a plan when PBGC determines that "the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a)(4). After determining that one of the enumerated circumstances exists, PBGC may enter into an agreement with the plan administrator to terminate the plan, which does not require a court adjudication. If, however, the plan administrator does not agree to a termination of the plan, after issuing notice to the plan administrator, PBGC may "apply to the appropriate United States district court for a decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c).

The threshold issue for the court to determine is whether, under 29 U.S.C. § 1342(c), a court may issue a decree terminating a pension plan if parties opposing termination fail to establish that PBGC acted arbitrarily in seeking termination, or whether PBGC must affirmatively establish grounds for termination. The bankruptcy court concluded that § 1342(c) of ERISA requires a *de novo* determination of the appropriateness of an involuntary plan termination. PBGC challenges this conclusion, arguing that the court should review PBGC's termination decision on the administrative record under the arbitrary and capricious standard. PBGC argues that since there is nothing in the applicable ERISA provisions demonstrating that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*, does not apply to the decision of PBGC, the court should apply the default standard of the APA, 5 U.S.C. § 706(2)(A),[3] and ask whether PBGC's determination was arbitrary

---

[3]The APA authorizes a court to set aside an administrative determination only on a showing that the determination is either (1) "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or (2) "unwarranted by the facts to the extent that the facts are subject to trial *de novo* by

10

and capricious. For the reasons stated below, this court agrees with the bankruptcy court that § 1342(c) requires the court to determine *de novo* the appropriateness of an involuntary plan termination.

First, § 704 states, "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." Section 1342(c) establishes an "other adequate remedy," namely, a decree from the appropriate district court adjudicating that a plan must be terminated. By providing as such, the express language of § 1342(c) removes involuntary termination actions from the purview of the APA.

Second, in issuing a decree adjudicating the appropriateness of a plan termination, the court, unlike PBGC, must consider the factors specified in § 1342(c). The statute empowers the court to determine whether a termination is required based on a need "to protect the interests of the participants, to avoid any unreasonable deterioration of the financial condition of the plan or to avoid any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c). Yet, it is not necessary for PBGC to consider these factors in determining that a plan must be terminated in the first instance. *See* 29 U.S.C. §1342(a), *supra*, note 5. While there is only a subtle difference between the factors considered by PBGC and the court, by setting forth these criteria for the court to consider, Congress implicitly rejected the arbitrary and capricious standard. Additionally, the standard of review under the arbitrary and capricious standard cannot be reconciled with the requirement that the court consider factors other than those on which PBGC relied for its determination. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a

the reviewing court," 5 U.S.C. § 706(2)(F).

11

satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc.* v. *State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 at 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983), *quoting Burlington Truck Lines, Inc.* v. *United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962). In reviewing the explanation of the agency, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.*, *quoting Bowman Transp., Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U.S. 281 at 285, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974); *Citizens to Preserve Overton Park* v. *Volpe*, 401 U.S. 402 at 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971). A judicial decree adjudicating that a plan must be terminated must consider more than the factors on which PBGC relied for its determination. As such, review under the arbitrary and capricious standard is inappropriate.

Third, the plain language of § 1342(c) establishes that the proceeding in the court is an adjudication and not merely an enforcement or review of PBGC's prior determination. The court agrees with PBGC that PBGC must make the determination in the first instance that a plan must be terminated; however, PBGC construes § 1342 as requiring a single determination. In fact, the statute calls for two determinations: the initial determination of PBGC that the plan must be terminated because of the existence of one of the factors specified in § 1342(a) and the subsequent determination of the court that the plan must be terminated based on the factors specified in § 1342(c). Only after PBGC makes its determination may it institute proceedings. *See* 29 U.S.C. § 1342(a) ("The corporation may institute proceedings under this section to terminate a plan whenever it determines that [one of the enumerated circumstances exists.]"). Thus, PBGC's determination cannot be described as the culmination of a plan termination.

12

Fourth, the judicial decree functions as a "substantial safeguard" for the rights of parties other than PBGC affected by plan termination, and deferential review of agency decision-making in that regard is incompatible with the judicial decree requirement. In § 1342(a), Congress established that with respect to "small plans" PBGC may establish a simplified procedure for termination "as long as that procedure includes substantial safeguards for the rights of the participants and beneficiaries under the plans, and for the employers who maintain such plans (including the requirement for a court decree under subsection (c) of this section)." 29 U.S.C. § 1342(a). The statute requires "substantial safeguards" for plan participants, beneficiaries, and sponsors. While PBGC has no interest in unnecessarily incurring liability for an unfunded plan, but it also has statutory responsibilities to protect participants and beneficiaries, and employers who pay premiums to PBGC. PBGC's interests are not necessarily furthered by allowing a plan to continue or in seeking to maximize the benefits of plan participants and beneficiaries. Thus, the court acts as a safeguard, thereby ensuring that the termination of a particular plan is required, and deferential review of agency decision-making is inconsistent with this responsibility.

The court acknowledges that the application of the *de novo* standard to an involuntary termination proceeding is a departure from the decisions of other district courts. In fact, this court initially saw the advantage of applying the arbitrary and capricious standard of the APA to PBGC's determinations when deciding whether to issue a decree under § 1342(c). Certainly, the arbitrary and capricious standard has its appeal in terms of streamlining the analysis and relying on the expertise of the PBGC. *See In re Pan Am. World Airways, Inc. Co-op. Retirement Income Plan*, 777 F. Supp. 1179, 1181-82 (S.D.N.Y. 1991) (reasoning that because there is nothing in the applicable ERISA provisions to show that the 5 U.S.C. §§ 706(2)(A) or (F) do not apply to the decision of PBGC, the

13

court would review PBGC's termination determination under the arbitrary and capricious standard); *PBGC* v. *Haberbush*, No. CV0002631GHKAIJX, 2000 WL 33362003, at \*5-7 (C.D. Cal. Nov. 3, 2000) (granting summary judgment in favor of PBGC and terminating pension plan after reviewing PBGC's decision under the arbitrary and capricious standard); *PBGC* v. *FEL Corp.*, 798 F. Supp. 239, 241-42 (D.N.J. 1992) (granting PBGC's request to terminate a pension plan after reviewing PBGC's decision under the arbitrary and capricious standard). But in the end, the court is not persuaded that arbitrary and capricious review applies to review of action taken under 1342(c).

In the first case, *In re Pan Am.*, the court held that there was nothing in the applicable ERISA provisions to show that either § 706(2)(A) or § 706(2)(F) of the APA should not apply to the decision of PBGC. 777 F. Supp. at 1181. This conclusion ignored the import of the language in § 1342(c) requiring a judicial decree adjudicating that the plan must be terminated. By providing for a decree adjudicating that the plan must be terminated, Congress removed involuntary termination proceedings from the sphere of the APA and gave the court the discretion to determine that a plan must be terminated.

As the court in *PBGC* v. *Heppenstall Company* explained, "Congress determined that in the absence of agreement between PBGC and a plan administrator the court would protect participants from overly cautious use of the involuntary termination feature of the insurance scheme. 633 F.2d 293 at 301 (3d Cir. 1980). In *Heppenstall*, the Third Circuit rejected PBGC's argument that the court should defer to PBGC's administrative expertise in deciding a plan's termination date because the statutory scheme relegates resolution of disputes over termination to the court in the first instance. *Id.*; *see* 29 U.S.C. § 1348(b)(3) (stating that "if no agreement is reached [between PBGC and the plan administrator as to the date of termination of a plan], the date [is] established by the

14

court"). Section 1342(c) likewise requires that the court adjudicate whether a plan must be terminated, which is Congress's delegation to the court of the responsibility of determining that a plan must be terminated.

Additionally, two of the courts relied on the Supreme Court's decision in *PBGC* v. *LTV Corp.*, 496 U.S. 633, 110 S. Ct. 2688, 110 L. Ed. 2d 579 (1990), in support of their decisions to apply the arbitrary and capricious standard of review. *See FEL*, 798 F. Supp. at 241; *Haberbush*, 2000 WL 33362003, at *6. But the Supreme Court in *LTV* was reviewing PBGC's decision restoring a terminated pension plan pursuant to 29 U.S.C. § 1347, which is a statute that differs significantly from § 1342.[4] Section 1347 does not require a decree adjudicating that a plan must be restored or otherwise require the court to determine the appropriateness of PBGC's decision. The court recognizes that many decisions of PBGC are entitled to deferential review under the APA, as in *LTV Corp.*; however, this does not perforce mean that the court must defer to PBGC's decision to seek an involuntary termination pursuant to § 1342(c).

_____

[4]29 U.S.C. § 1347 provides:

Whenever the corporation determines that a plan which is to be terminated under section 1341 or 1342 of this title, or which is in the process of being terminated under section 1341 or 1342 of this title, should not be terminated under section 1341 or 1342 of this title as a result of such circumstances as the corporation determines to be relevant, the corporation is authorized to cease any activities undertaken to terminate the plan, and to take whatever action is necessary and within its power to restore the plan to its status prior to the determination that the plan was to be terminated under section 1341 or 1342 or this title. In the case of a plan which has been terminated under section 1341 or 1342 of this title the corporation is authorized in any such case in which the corporation determines such action to be appropriate and consistent with its duties under this subchapter, to take such action as may be necessary to restore the plan to its pre-termination status, including, but not limited to, the transfer to the employer or a plan administrator of control of part or all of the remaining assets and liabilities of the plan.

15

## A. Facts Established in the Bankruptcy Court Proceedings

### 1. Sufficiency of Notice

In ruling on summary judgment, the bankruptcy court determined that if PBGC proved that the Pilot Plan must be terminated, it would be necessary to consider whether the notice provided by PBGC was sufficient to establish a termination date of December 30, 2004. Finding that there were no genuine issues of fact for trial, the bankruptcy court held that PBGC was entitled to an order establishing that its notice of December 30, 2004 was effective. ALPA objects to this finding, arguing that PBGC was required to provide individualized notice to each of the approximately 15,000 participants of the Pilot Plan. The bankruptcy court was correct.

As stated previously, when PBGC and the plan administrator cannot agree on the termination date of a plan, the court must set one. 29 U.S.C. § 1348(a)(3), (4). To establish a termination date, the court considers (1) "the expectation of the plan participants," and (2) "the financial implications of the termination for PBGC." *See PBGC* v. *Republic Techs. Int'l, LLC*, 386 F.3d 659, 665 (6th Cir. 2004) (collecting cases). This analysis requires the court to "determine the earliest date when the plan participants had actual or constructive notice of the plan's termination, *i.e.*, notice sufficient to extinguish their reliance interests." *Id.*, *citing In re Pension Plan for Employees of Broadway Maintenance Corp.*, 707 F.2d 647, 652-53 (2d Cir. 1983). After that date is determined, the court "should then select whatever later date serves the interest of PBGC." *Id.*, *quoting Broadway Maintenance Corp.*, 707 F.2d at 652-53.

Courts have recognized various methods for PBGC to give actual or constructive notice to plan participants. *See Heppenstall*, 633 F.2d at 302 (acknowledging that constructive notice would suffice such as notice to the collective bargaining representative); *Republic Techs. Int'l, LLC*, 386

F.3d at 664, 668 (holding that publishing a notice in hometown newspapers and issuing a notice of termination the day before the date set as the termination date to the plan administrator and the union representative gave sufficient notice to the participants); *In re Pan Am.*, 777 F. Supp. at 1185 (holding that receipt of actual notice by plan participants satisfied PBGC's notice requirement).

PBGC sent its Notice of Determination to ALPA on December 29, 2004, and ALPA received this notice the following day, December 30, 2004. The Notice of Determination also was published nationally in newspapers throughout the country on December 30, 2004. That same day, PBGC, United, and ALPA published press releases on their websites announcing PBGC's decision to seek termination of the Pilot Plan. These efforts by PBGC provided constructive notice to the plan participants that the plan would be terminated, effective December 30, 2004, such that the Pilot Plan's participants "no longer had a justifiable expectation in the accrual of vested pension rights." *Heppenstall*, 633 F.2d at 302.

The sufficiency of the collective, constructive notice provided by PBGC is consistent with the distinction between the notice requirements of 29 U.S.C. § 1342(c) and 29 U.S.C. § 1342(d)(2)(B). Congress mandated only that PBGC provide notice to the plan administrator before seeking a decree adjudicating that a pension plan must be terminated. *See* 29 U.S.C. § 1342(c). In contrast, if a trustee of a pension plan seeks termination of the plan, he must give notice to "each participant in the plan and each beneficiary of a deceased participant . . . ." 29 U.S.C. § 1342(d)(2)(B). While PBGC must give notice, Congress lessened the burden on PBGC as to each of the plan participants and beneficiaries. Had Congress intended that PBGC provide individualized notice to each of the participants and beneficiaries, Congress would have so provided.

ALPA argues, however, that the two-part test that the bankruptcy court applied was

17

developed in wholly different circumstances in which a plan sponsor had ceased operations or was close to liquidation. While the economic circumstances faced by the employers and plan participants in *Heppenstall* and *Republic Technologies* were more dire than those confronted by the plan participants and beneficiaries in this case, the Notice of Termination sent by PBGC to United and ALPA, published in numerous newspapers, and discussed in the press releases of PBGC, United, and ALPA communicated effectively to the Pilot Plan's participants and beneficiaries that PBGC was seeking to terminate the plan. The Pilot Plan's participants and beneficiaries had the ability to acquire the knowledge that PBGC was seeking to terminate the Pilot Plan by reasonably diligent inquiry. *See Eckstein* v. *Balcor Film Investors*, 58 F.3d 1162, 1168 (7th Cir. 1995) (noting that "constructive notice" means "no actual knowledge but the ability to acquire knowledge by reasonably diligent inquiry"). Moreover, ALPA's construction of the notice requirement is contrary to the language of §§ 1342(a)(4) and 1342(c), which allow PBGC to seek an involuntary termination, after giving notice to the plan administrator, based on the increase in PBGC's liability and not the condition of the employer.

ALPA argues further that its communications that it intended to challenge termination of the Pilot Plan and other developments, including a ratification vote on a modified agreement, raised such a strong expectation of plan continuation that PBGC's notice was ineffective. This argument was considered and rejected by the Sixth Circuit in *Republic Technologies*, which explained that "[e]very court to consider the issue has concluded that expectation interests in the accrual of benefits are extinguished on the date the participants receive reasonable notice from PBGC that the plan is going to be terminated." 386 F.3d at 667. The court sees no reason to depart from this standard in this case. The issue of notice does not focus on whether the plan participants agree with PBGC's

18

decision to seek a termination or whether to contest the termination; it focuses on whether the plan participants had the knowledge or the ability to acquire the knowledge that PBGC was seeking to terminate the plan that was sufficient to extinguish their reliance interests. To find to the contrary would require courts to establish a sliding scale approach on the issue of notice, rendering the efficacy of PBGC's notice contingent upon how vigorously parties contest the involuntary termination proceeding, the financial conditions of the employer, and whether each participant had knowledge of both the notice of termination and the efforts to contest the termination. Such an approach would necessarily delay the date of termination, thereby increasing PBGC's liability contrary to the purpose of § 1342(c).

Having determined that the constructive notice provided to the Pilot Plan's participants and beneficiaries was effective as of December 30, 2004, the court considers whatever later date serves the interest of PBGC. *See PBGC* v. *Mize Co., Inc.*, 987 F.2d 1059, 1063 (4th Cir. 1993) ("PBGC's interests should be deemed to be best served by the date proposed by PBGC."). Here, December 30, 2004 is the date the best serves PBGC's interests, as any later date would result in PBGC's incurring an increase in its liability.

2. Increase in PBGC's Liability

ALPA and URPA challenge the bankruptcy court's conclusion that PBGC met its burden under § 1342(c) to prove that the Pilot Plan should be terminated, effective December 30, 2004. Almost all of the evidence at trial focused on the extent of the loss that PBGC's fund would assume if the termination of the Pilot Plan did not occur until after December 30, 2004. Four actuarial witnesses testified. Documentary evidence consisted of excerpts from PBGC's administrative record and other internal documents, the agreements between United and ALPA modifying their collective

19

bargaining agreements, and reports and other materials prepared by the parties' expert witnesses. The testimony of PBGC's witnesses evidenced that the total increase in PBGC's liability for the Pilot Plan from December 2004 through June 2005 would be $101 million: $44 million in increased liability if the plan terminated in January 2005 rather than December 2004 plus an additional $9.5 million per month in increased liability through June 2005. The testimony of ALPA's witness evidenced that the increase would be $79 million: $39 million in increased liability if the plan terminated after December 30, 2004 plus an additional monthly increase of $6.7 million.

The weight of the evidence at trial supported PBGC's calculation of the initial increased liability of PBGC, $44 million. In this calculation, PBGC documented an increase in maximum benefits guaranteed by PBGC that would result in increased liability for PBGC because many participants in the Pilot Plan were entitled to plan benefits that exceeded the amount guaranteed by PBGC. ALPA's expert did not explain his reason for his lower estimate. The weight of the evidence at trial supported ALPA's calculations as to the monthly increases in PBGC's liability through June 2005, $6.7 million, as the methodology of ALPA's expert reduced these monthly liability increases to present value, and PBGC had failed to document its correction of an initial, acknowledged error in calculating the effect of a non-terminated plan paying benefits in excess of guaranteed amounts. Thus, the evidence established that PBGC's total increase in liability through June 2005 would be $84.2 million.

3. The Pilot Plan Would Terminate

ALPA and URPA object to the bankruptcy court's finding that PBGC proved by a preponderance of the evidence that the Pilot Plan was likely to terminate. Although PBGC did not have a witness to testify as to whether the Pilot Plan would terminate or the financial condition of

20

United, the bankruptcy court took judicial notice of matters of public record, which, taken together, support the reasonable inference that the Pilot Plan would terminate. The bankruptcy court considered, *inter alia*, that United had been in bankruptcy since December of 2002; United had announced that it needed to terminate all of its pension plans in order to successfully emerge from bankruptcy; United had initiated a 1113 proceeding to remove from its collective bargaining agreements provisions requiring contributions to the pension plans; and United's business plan in August of 2004 did not provide for any pension contributions.

ALPA and URPA argue, however, that the bankruptcy court relied on documents that it had previously held inadmissible and hearsay statements that PBGC never attempted to introduce into evidence. ALPA and URPA argue further that had the bankruptcy court made proper findings of fact, it would have been obliged to take into account the fact that the only evidence introduced at trial regarding the likelihood of plan termination was the Kramer Report, which ALPA and URPA assert demonstrated that the Pilot Plan did not need to be terminated. It was proper, however, for the bankruptcy court to take judicial notice of matters of public record. *See Menominee Indian Tribe of Wisconsin* v. *Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) (stating that "[j]udicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper" ). And the Kramer Report offered the opinion that not all four of United's pension plans needed to be terminated, but it did not establish that United would choose to save the Pilot Plan if it had to choose between the plans.

ALPA and URPA also argue that the bankruptcy court should not have relied on United's agreement with ALPA to support the termination or United's statements that it would have to terminate its pension plans in order to emerge from bankruptcy. As recognized by the bankruptcy

court, however, the ALPA agreement demonstrated United's position that the plan needed to be terminated in order for United to emerge from bankruptcy. United's statements that it would have to terminate its pension plans in order to emerge from bankruptcy, while not admissible for their truth, are admissible as evidence of United's bankruptcy plan and its intent. United intended to terminate its pension plan in order to emerge from bankruptcy. United's intent, coupled with numerous matters of public record, allowed the bankruptcy court to draw the reasonable inference that the Pilot Plan would terminate. Importantly, when asked by the bankruptcy judge, neither ALPA nor URPA offered any evidence contradicting the inference that the Pilot Plan would terminate[5] Thus, although the evidence that the Pilot Plan would terminate was somewhat sparse, it was credible and uncontradicted. As such, the bankruptcy court correctly determined based on a preponderance of the evidence that the that the Pilot Plan would terminate.

3. Unreasonable Increase in PBGC Liability

Having determined that the Pilot Plan would terminate, the bankruptcy court considered whether the increase in liability of PBGC, whether $79 million or $101 million or some amount in between, would be "unreasonable," as required for termination under § 1342(c). Section 1342(c) specifies that the court will issue a decree adjudicating that a plan must be terminated to avoid any unreasonable increase in the liability of the fund. 29 U.S.C. § 1342(c). The statute, however, does not define "unreasonable." There is also little guidance in the way of case law or legislative history. *See In re Pan Am.*, 777 F. Supp. at 1182 (discussing former version of § 1342(c) which utilized "further increase" rather than "unreasonable increase" language). Lacking guidance by the statute,

---

[5]URPA offered the testimony of an actuarial witness as to a "split-freeze plan" as evidence that the termination of the Pilot Plan was not necessary. The witness acknowledged, however, that United was unwilling to pursue this plan. As a result, while this alternative plan was theoretically possible, it was not likely to transpire.

the bankruptcy court fashioned a standard that requires both a monetarily significant increase in PBGC's liability and a plan likely to terminate in an underfunded condition, such that the increase in liability would be reflected in an actual additional loss for PBGC's insurance fund. ALPA and URPA object to the bankruptcy court's "unreasonable increase" standard, arguing that an "unreasonable increase" must be determined based on something more than increases that resulted from the ordinary operation of a plan and that considered the overall amount of the increase in the context of the plan's total assets. The court sustains in part and overrules ALPA and URPA's objections.

First, the statute specifies "*any* unreasonable increase." This word choice demonstrates that the focus of the court's consideration is to be the increase itself and whether that amount is unreasonable rather than on ALPA's view that the cause of the increase matters. Accordingly, that the initial increase in PBGC's liability in this case would result from a statutory annual adjustment has no bearing on whether that increase in PBGC's liability is unreasonable.

Second, when considered in the context of the statute, an "unreasonable increase" in PBGC's liability constitutes a monetarily significant amount. Title IV endows PBGC with the responsibility of furthering the statutory purposes of Title IV identified by Congress. *LTV Corp.*, 496 U.S. at 649. These purposes are

(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants,
(2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and
(3) to maintain premiums established by [PBGC] under section 1306 of this title at the lowest level consistent with carrying out the obligations under this subchapter."

*Id.*, quoting 29 U.S.C. § 1302(a). These purposes do not always coexist peaceably. At times, such as in the present matter, PBGC must forego encouraging the continuation and maintenance of a

23

particular plan in order to ensure that an increase in PBGC's liability does not affect negatively the payment of benefits to all participants and beneficiaries or the premiums established by PBGC. Additionally, PBGC must confront a $23 billion deficit[6] and, therefore, must be vigilant in limiting its losses while continuing to protect its statutorily-defined responsibilities. *See In re UAL Corp.*, 428 F.3d 677 at 681 (7th Cir. 2005) (stating that "[t]hrough 29 U.S.C. § 1342, Congress authorized PBGC to terminate a failing plan so that PBGC could nip a plan's increasing losses and thereby reduce PBGC's exposure to mounting liabilities."). A monetarily significant amount is the best gauge as to the effect PBGC's increased liability would have on its statutory responsibilities.[7]

Third, the court is guided by the reasoning of the court in *Heppenstall* in the balancing of competing interests involved in an involuntary termination. In *Heppenstall*, the court was tasked with determining the termination date of a plan pursuant to § 1348(b)(2), and to resolve this issue, the court weighed the competing interests involved, the same interests at issue here: PBGC's interest as an insurer in promptly terminating an underfunded plan in order to avoid additional losses to its insurance fund and the plan participants' interest in receiving expected benefits. 633 F.2d at 301-02.

Here, PBGC's interest is furthered when a plan is terminated because its continued operation would result in a depletion of PBGC's insurance fund, while the participants' interest is furthered by not terminating a plan that would not result in such a depletion. In this regard, the court departs

---

[6]The PBGC's deficit is a matter of public record. *See* PBGC's 2005 Performance Accountability Report at p.4, http://www.pbgc.gov/workers-retirees/about-pbgc/content/page13176.html. The court make take judicial notice of matters of public record. *See Menominee Indian Tribe of Wisconsin*, 161 F.3d at 456.

[7]The court in the *Pan Am* case similarly stated, "A substantial increase in . . .[PBGC's] potential liability, with no certain prospect that such potential liability can be recouped, should be regarded under this statute as unreasonable because the PBGC fund must be available to protect the minimally guaranteed benefits of all covered plans in the United States, not just the benefits of Pan Am employees." *In re Pan Am.*, 777 F. Supp. at 1183. That court, however, relied on the arbitrary and capricious standard in finding that an additional liability of $700,000 per month was unreasonable. As such, it does not provide much assistance to the court under the *de novo* standard.

24

from the bankruptcy court's construction of the appropriate standard. This court's construction of § 1342(c) is consistent with its express language, which provides that the court will issue a decree adjudicating that a "plan *must* be terminated to avoid ... *any unreasonable increase* in the liability of the fund." It is not the potential increase in the liability of PBGC that Congress sought to avoid by granting PBGC the authority to initiate involuntary termination proceedings. Rather, it is any actual, unreasonable increase in the liability of the fund, and this is best measured by a monetarily significant amount. Thus, the court sustains the objection of URPA that the bankruptcy court impermissibly lowered the standard for determining whether a plan must be terminated by ruling that PBGC was required to show that the Pilot Plan was *likely* to terminate in an underfunded condition. Because the evidence presented to the bankruptcy court established that the Pilot Plan would terminate, this alteration of the standard does not affect the outcome of this involuntary termination proceeding.

The ultimate question is whether $84.2 million is monetarily significant. There is no bright line standard to apply, as "significant" is, of course, a relative term. It requires a context. Considered in absolute terms, $84.2 million is a large amount of money. Yet, if $84.2 million is considered in the context of PBGC's overall liability for the Pilot Plan, $84.2 million is not particularly significant, as the record shows that the potential increase in PBGC's liability is less than three percent of the Pilot Plan's total assets. At the same time, liability increases of much smaller amounts have been seen as grounds for termination. *See Heppenstall,* 633 F.2d at 300 (noting termination based on an increase in liability of $3-4 million). In the context of PBGC's deficit of $23 billion, an additional $84.2 million is a significant burden and a significant additional loss for PBGC's insurance fund, particularly since PBGC can avoid that additional liability with a December

25

30, 2004 termination date. In that regard, the significance of the $84.2 million is measured in the context of PBGC's economic position, the dollar amount of PBGC's increased liability, and the ability of PBGC to avoid that liability. Evaluating the significance of the $84.2 million in this context best accommodates PBGC's competing responsibilities to its fund, its beneficiaries, and employers who pay premiums, as it is PBGC's liability that is the focus of the inquiry and not a particular plan. In this context, the $84.2 million is monetarily significant.

As set forth above, PBGC satisfied its burden at trial of establishing by a preponderance of the evidence that the Pilot Plan must be terminated. First, the evidence showed that the increase in PBGC's liability was a monetarily significant amount, as PBGC's total increase in liability through June 2005 would be $84.2 million. Second, the uncontroverted evidence at trial demonstrated that the Pilot Plan would not continue. As a consequence, the termination of the Pilot Plan is necessary to avoid an unreasonable increase in PBGC's liability. Thus, the court will issue a decree of termination and the termination date of the plans will be December 30, 2004.

## ORDER

For the reasons stated above, the court accepts the bankruptcy court's proposed findings of fact and conclusions of law as modified. The court concludes that the termination of the Pilot Plan is necessary to avoid an unreasonable increase in PBGC's liability. A decree of termination will issue and the termination date is fixed at December 30, 2004.

Enter: *Joan H. Lefkow*

JOAN HUMPHREY LEFKOW
United States District Judge

Date: June 13, 2006